# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JAYDEN VARLINE, for herself and on behalf of all others similarly situated; BRIAN RICHARDS; JONICA RICHARDS; JENSEN RICHARDS; DANIEL PAUL; ELIZABETH PAUL; ANNETTE SCHAETZL; TREVOR CUNNINGHAM; EMILY CUNNINGHAM; RICHARD RUBOW; MICHAEL HEISE; STACY HEISE; AMANDA ZASTROW; STEVEN ZASTROW; SCOTT TOWLE; JESSICA TOWLE; PERRY REDEKER; RUTH REDEKER; MATTHEW BRILL; JANET OSTROWSKI; and TOM FELTZ, | **CLASS COMPLAINT WITH INDIVIDUAL CLAIMS** <br><br> **Jury Trial Demanded** <br><br> **C.A. No. __24-CV-00859_____** |
| *Plaintiffs,* | |
| *v.* | |
| THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., | |
| *Defendant.* | |

## CLASS COMPLAINT WITH INDIVIDUAL CLAIMS
## AND DEMAND FOR JURY TRIAL

Plaintiffs, JAYDEN VARLINE, individually and on behalf of all others similar situated;

BRIAN RICHARDS; JONICA RICHARDS; JENSEN RICHARDS; DANIEL PAUL;

ELIZABETH PAUL; ANNETTE SCHAETZL; TREVOR CUNNINGHAM; EMILY

CUNNINGHAM; RICHARD RUBOW;  MICHAEL HEISE; STACY HEISE; AMANDA

ZASTROW; STEVEN ZASTROW; SCOTT TOWLE; JESSICA TOWLE; PERRY REDEKER;

RUTH REDEKER;  MATTHEW BRILL; JANET OSTROWSKI; and TOM FELTZ, by and

through their undersigned counsel, DAVCZYK & VARLINE, LLC, hereby file this Class Action

Complaint, individually, and on behalf of all others similarly situated, and with individual claims,

and make these allegations based on information and belief against Defendant THE 3M COMPANY, f/k/a Minnesota Mining Manufacturing Co. ("3M" or "Defendant"):

## **INTRODUCTION**

1.      This action arises from the foreseeable contamination of groundwater by the use of materials that contained per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and/or perfluorooctanesulfonic acid ("PFOS").

2.      This action pertains solely to PFAS and it is not related to AFFF (Aqueous Film-Forming Foam).

3.      Plaintiffs' and putative Class Members are all residents of the Village of Maine, Wisconsin whose private wells have been contaminated with PFAS.

4.      The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") owns and operates two facilities in Wisconsin: 1) the 3M Downtown Wausau Facility; and 2) the 3M Greystone Facility and Quarry which is located in the Village of Maine.

5.      The 3M Greystone Facility and Quarry is located at 499 North 4th Avenue in Wausau,[1] which is located approximately one mile from the Village of Maine.

6.      In the 1930's, 3M was approached by a shingle manufacturer to mine and color rock for the shingle industry which led to the production of roofing granules.[2]

7.       3M Geologists searched for a more suitable rock to be used for roofing granules and found the site known today as the Greystone Quarry, which has been operating since the 1930's.[3]

---

[1] Geraghty & Miller, Inc. Environmental Services (1991). *Soil and Ground-Water Investigation at Former UST Site. 3M Downtown Facility Wausau and Greystone Facilities, Wausau, Wisconsin.* Retrieved from https://apps.dnr.wi.gov/botw/GetActivityDetail.do?dsn=22047&crumb=0

[2] 3M Wausau Plant *available at* https://www.3m.com/3M/en_US/plant-locations-us/wausau/

[3] *Id.*

8.     Construction of the Greystone Crushing Facility began in 1952 and was finished in 1954.[4]

9.     Today rock continues to be mined from the Greystone Quarry which is sent through a series of crushers and screeners until each rock is the right particle size for roofing granules.[5]

10.     On information and belief, the 3M classic and copper roofing granules, as well as natural pozzolan manufactured at the Downtown Facility have been disposed of for decades at the Greystone Facility and Quarry.

11.     On information and belief, the roofing granules are coated PFAS, such as PFOA and/or PFOS, and/or N-Ethyl Perfluorooctane Sulfonamide Acetic Acid (NEtFOSAA).

12.     NEtFOSAA is one of several PFAS that can convert into PFOS in the body and the environment.

13.     In 2023, the Greystone Facility reported levels of PFOA at 210 ng/L and PFOS at 310 ng/L (also expressed as ppt).

14.     On March 28, 2024, the Greystone Facility reported levels of NEtFOSAA at 20 ng/L (also expressed as ppt).

15.     In August 2024, the EPA asked 3M to: "Provide dates for the following events: (a) 3M first synthesizes or purchases NEtFOSAA; (b) 3M first uses NEtFOSAA commercially or industrially; (c) 3M uses NEtFOSAA in any stage of the commercial or industrial process to produce or treat roofing granules; (d) NEtFOSAA is first present at the 3M Greystone Facility; (e) NEtFOSAA is first present at the 3M Downtown Wausau Facility."[6]

---

[4] *Id.*

[5] *Id.*

[6] Kilian, Tom. "Column: New questions from regulators regarding 3M and PFAS in Wausau's water: Federal regulators are examining where a chemical found in Wausau's groundwater is coming from. An investigation is underway."  Wausau Pilot & Review, October 11, 2024.

16.     3M was the sole manufacturer of PFOS in the United States, meaning the source of the PFOS contamination discovered at the Greystone Facility could only have been manufacturing of 3M's products containing PFOS.

17.     Due to this contamination, Plaintiffs have suffered real personal injuries, are at an increased risk of developing injuries, bioaccumulation of PFAS in their bodies, property damage, and the diminution in value of their properties as a result of the release of PFAS to their water supplies.

18.     Plaintiffs have suffered an assortment of diseases and medical conditions as a direct result of their exposure to PFAS contamination of their water supply.

19.     Plaintiffs, as residents and those who visited, worked, or otherwise dwelled in the Village of Maine, have been unknowingly exposed for many years to PFAS, including concentrations hazardous to their health.

20.     Plaintiffs' unwitting exposure to PFAS in their water supply as a result of the Defendant's conduct, is the direct and proximate cause of Plaintiffs' injuries.

21.     Plaintiffs' properties have been damaged as a result of the presence of the PFAS in their water supply

22.     The Putative Class includes all residents of the Village of Maine who were exposed to drinking water contaminated with PFOS.

## JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and amount in controversy exceeds $75,000.

24.     Plaintiffs bring this civil suit, in part, pursuant to: 42 U.S.C. §§ 9607, 9607(a), and 9613(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

25.     Venue is proper in the United States District Court for the Western District of Wisconsin in that Defendant has sufficient connections to this district pursuant to 28 U.S. Code § 1391(b)(3).

## THE PARTIES

**Class Representatives with Individual Personal Injury and Property Damage Claims**

26.     Plaintiff **Jayden Varline** is a resident of 1794 Windrush Drive, Grafton, Wisconsin. Plaintiff resided most of her life at the Village of Maine, 305 Brentwood Road, Wausau, WI 54401. The property receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff has been exposed to elevated levels of PFAS through the water and has a bioaccumulation of PFAS in her blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with thyroid disease. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

**Individuals With Personal Injury and Property Damage Claims**

27.     Plaintiff **Brian Richards** is a resident of the Village of Maine, Wisconsin, who currently resides at 305 Brentwood Road, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated

water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular, and kidney cancer.

28.     Plaintiff **Jonica Richards** is a resident of 4122 Green Avenue, Madison, Wisconsin. Plaintiff resided most of her life at the Village of Maine, 305 Brentwood Road, Wausau, WI 54401. The property receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff has been exposed to elevated levels of PFAS through the water and has a bioaccumulation of PFAS in her blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with Preeclampsia. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

29.     Plaintiff **Jensen Richards** is a resident of the Village of Maine, who currently resides at 305 Brentwood Road, Wausau, WI. The property receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

30.     Plaintiff **Daniel Paul** is a resident of the Village of Maine, who currently resides at 600 Excel Drive, Wausau, WI. Plaintiff owns the property, which currently receives water from a

private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

31.     Plaintiff **Elizabeth Paul** is a resident of the Village of Maine, who currently resides at 600 Excel Drive, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

32.     Plaintiff **Annette Schaetzl** is a resident of the Village of Maine, who currently resides at 4603 N 32nd Avenue, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets,

showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with high cholesterol. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.

33.     Plaintiff **Trevor Cunningham** is a resident of the Village of Maine, who currently resides at 2806 Burek Avenue, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

34.     Plaintiff **Emily Cunningham** is a resident of the Village of Maine, who currently resides at 2806 Burek Avenue, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff

has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of her exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

35.     Plaintiff **Richard Rubow** is a resident of the Village of Maine, who currently resides at 3901 Falcon Drive, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

36.     Plaintiff **Michael Heise** is a resident of the Village of Maine, who currently resides at 3400 N 14th Avenue, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply,

Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

37.     Plaintiff **Stacy Heise** is a resident of the Village of Maine, who currently resides at 3400 N 14th Avenue, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

38.     Plaintiff **Amanda Zastrow** is a resident of the Village of Maine, who currently resides at 603 Excel Dr, Wausau, WI 54401. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff has been exposed to elevated levels of PFAS through the water and has a bioaccumulation of PFAS in her blood. As a result of her exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with  thyroid disease and high cholesterol. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

39.     Plaintiff **Steven Zastrow** is a resident of the Village of Maine, who currently resides at 603 Excel Dr, Wausau, WI 54401. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

40.     Plaintiff **Scott Towle** is a resident of the Village of Maine, who currently resides at 3603 N 14th Ave, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

41.     Plaintiff **Jessica Towle** is a resident of the Village of Maine, who currently resides at 3603 N 14th Ave, Wausau, WI. Plaintiff owns the property, which currently receives water from

a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of her exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

42.     Plaintiff **Perry Redeker** is a resident of the Village of Maine, who currently resides at 2804 Burek Ave, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with Prostate Cancer and Thyroid Disease. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, changes in thyroid hormone, testicular, and kidney cancer.

43.     Plaintiff **Ruth Redeker** is a resident of the Village of Maine, who currently resides at 2804 Burek Ave, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets,

showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with Thyroid Disease. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

44.     Plaintiff **Matthew Brill** owns a business in the Village of Maine, located at 2200 N. 44th Ave., Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of his exposure to PFAS in the contaminated water supply, Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

45.     Plaintiff **Janet Ostrowski** is a resident of the Village of Maine, who currently resides at 2801 Burek Ave, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff

has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in her blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with high cholesterol. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

46.     Plaintiff **Tom Feltz** is a resident of the Village of Maine, who currently resides at 301 W, Cassidy Dr, Wausau, WI. Plaintiff owns the property, which currently receives water from a private well. PFAS chemicals, including but not limited to PFOS, have entered the water, property and soil, including but not limited to through the accumulation in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff's property has been damaged as a result of the contamination of PFAS, including but not limited to PFOS. Plaintiff has been exposed to elevated levels of PFAS through Plaintiff's water and has a bioaccumulation of PFAS in his blood. As a result of the exposure to PFAS in the contaminated water supply, Plaintiff has been diagnosed with high cholesterol. Plaintiff is at an increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, testicular and kidney cancer.

## **DEFENDANT**

47.     Defendant, The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

48.     From the early 1960s through at least 2002, 3M designed, manufactured, marketed, distributed, and sold products containing PFOS.

49.     Upon information and belief, Defendant is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused

and continues to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### A.    PFAS and Their Risk to Public Health

50.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

51.    The two most widely studied types of these substances are PFOA and PFOS.

52.    PFOA and PFOS have unique properties that cause them to be: (a) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (b) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (c) toxic, meaning that they pose serious health risks to humans and animals.

53.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

54.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

55.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

56.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

57.     PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

58.     The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

59.     Exposure to PFAS is toxic and poses serious health risks to humans and animals.

60.     PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

61.     Beginning in the 1950s, Defendant designed, manufactured, marketed, distributed, and/or sold PFAS products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

62.     On information and belief, Defendant was aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the roofing granules designed, manufactured, marketed, distributed, and/or sold by Defendant.

63.     On information and belief, 3M designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the roofing granules disposed into the environment resulting in widespread PFAS contamination.

64.     On information and belief, Defendant designed, manufactured, marketed, distributed, and/or sold the roofing granules disposed into the environment resulting in widespread PFAS contamination.

**B.      Defendant's Knowledge of the Threats to Public Health and the Environment Posed by PFAS**

65.     On information and belief, by at least the 1950s 3M knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

66.     On information and belief, 3M concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFOA and PFOS.

67.     3M understood how stable the fluorinated surfactants used in PFAS are when released into the environment from their first sale to a customer, yet it failed to warn its customers or provide reasonable instruction on how to manage wastes generated from its roofing granules.

**1940s and 1950s: 3M and the Development of a Toxic Chemical Family**

68.     The development of this family of chemical compounds began with Defendant 3M in the 1940s. At that time, 3M's Central Research Laboratory was working with a scientist at Penn State University, Joseph H. Simons, who had developed and patented a process of preparing fluorine compounds through electrochemical fluorination ("ECF"). In 1945, 3M acquired Simons' ECF patents. It would be another three years before 3M's Central Research developed fluorinated compounds that could be used for commercial applications. During that time, 3M scientists continuously researched and created new fluorochemicals; in the words of one researcher, "[a]lmost every day we made a new molecule which had never been on the face of the earth before."[7]

---

[7] Neil McKay, A Chemical History of 3M: 1933-1990.
https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1365.pdf

69.     From the early days of its fluorochemical research, 3M recognized the very characteristics that make PFAS persistent pollutants in the environment today. For example, Simons' 1948 patent for the ECF process, which was assigned to 3M, stated that the compounds produced through ECF are non-corrosive, and of little chemical reactivity, and do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures.[8] The patent also stated that the fluorochemicals produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[9]

70.     3M was also aware of the thermal stability of its fluorinated compounds prior to commercial production.  Simons' ECF patent application states that the compounds produced by the ECF process were thermally stable at temperatures up to 750° C (1382º F).  Additional research by 3M expanded its understanding of the thermal stability of fluorinated compounds.[10]

71.     In 1949, 3M built the first manufacturing facility to expand ECF from laboratory research to commercial production, and it began to present its fluorochemical research in order to find potential uses and customers for the compounds it was manufacturing.

72.     3M soon found a customer: DuPont. In 1951, DuPont began purchasing a perfluorinated carboxylic acid (perfluorooctanoic acid or PFOA), for use in manufacturing a non-stick coating called Teflon.

---

[8] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.

[9] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

[10] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

73.     Even then, 3M's research had already documented that PFAS accumulate in the blood of mice exposed to the chemicals in laboratory tests.[11] Also, a 1956 study by researchers at Stanford University found that PFAS binds to proteins in human blood.[12]

**1960s: PFAS Chemical Environmental Hazards Come Into Focus**

74.     By at least the end of the 1960s, additional research and testing performed by 3M had indicated that fluorosurfactants, including at least PFOS and PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

75.     One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[13] Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soils and groundwater.

76.     3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the adsorption and mobility of FC-95 (the potassium salt of PFOS) and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[14]

---

[11] 1950 3M test study results with Perfluorobutyric acid. https://static.ewg.org/reports/2019/pfa-timeline/1950_Mice.pdf?_ga=2.21758526.426747500.1673645134-2012946541.1673645134.

[12] Perfluorooctanoic Acid Interactions with Human Serum Albumin, *available at* https://static.ewg.org/reports/2019/pfa-timeline/1956_Stanford.pdf?_ga=2.59569645.1994765108.1678715813-813372143.1678715813.

[13] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[14] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil, Feb. 27, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

77.     Despite early warnings of the toxic, persistent, and bioaccumulative nature of PFOS and PFOA, these chemicals began to be used in products that would be released in large quantities directly into the environment whenever used.

78.     On information and belief, Defendant designed, manufactured, marketed, distributed, and/or sold roofing granules disposed into the environment resulting in widespread PFAS contamination.

79.     Defendant treated PFOS as proprietary information and did not disclose the specific chemical ingredients of their formulations to government agencies or the public.

80.     Defendant understood how stable PFAS chemicals are when released into the environment from their first sale to a customer, yet they failed to warn its customers or provide reasonable instruction on how to manage wastes generated from its products.

**1970s-1980s: Internal Studies Provide Evidence of Environmental and Health Risks**

81.     By at least the 1970s, as Defendant expanded the market for products containing PFOA and PFOS, 3M knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

82.     During the 1970s, 3M also learned that PFAS chemicals accumulated in the human body and were "even more toxic" than previously believed.

83.     An internal memo from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[15] But if 3M did give this issue the attention demanded at this time, it did not share it with the public.

84.     In 1975, two independent toxicologists, Dr. Warren Guy and Donald Taves, discovered that an unidentified fluorine compound had been found in human blood sampled from

---

[15] Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

different blood banks. Dr. Guy contacted 3M to ask if it knew of "possible sources" of the chemicals.[16] 3M's scientists concluded internally that the fluorine compounds resembled PFOS manufactured by 3M, but 3M did not share this conclusion with the independent toxicologists or anyone else outside of 3M.

85.     3M did, however, test the blood of its own workers in 1976, finding "up to 1000 times 'normal' amounts of organically bound fluorine in their blood".[17]

86.     By the mid-1970s, 3M had an intimate understanding of the persistent nature of PFAS. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS, a result that 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[18]

87.     A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFAS is "likely to persist in the environment for extended period unaltered by metabolic attack."[19] A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared that waterways were the fluorosurfactant's "environmental sink."[20]

88.     At the same time, several studies sponsored by 3M showed that the fluorosurfactants used in PFAS products were even more toxic than previously believed. A study of subacute toxicity in rhesus monkeys, in which the monkeys were to be given doses of PFOS

---

[16] Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.

[17] 3M Chronology – Fluorochemicals in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf.

[18] Technical Report Summary, August 12, 1976 [3MA01252037].

[19] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

[20] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf.

over ninety days, had to be redesigned and repeated "[b]ecause of unexpected early mortalities in all monkeys at all levels."[21] None of the monkeys survived past twenty days. As a summary of the study stated, PFOS "proved to be considerably more toxic to monkeys than anticipated[.]" In addition, PFOA reduced the survival rate of fathead minnow fish eggs,[22] and PFOS and PFOA were shown to be toxic to rats.[23] As the summary documented observed, "[b]ecause of the apparent persistence of these fluorochemicals in the body, *the most important question remains possible long term effects*."[24]

89.     In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[25] More than a decade after 3M began selling products containing fluorosurfactants it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals." The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"[26]

90.     In 1979, 3M and DuPont discussed 3M's discovery of high levels of PFOS in the blood of its workers. Both companies came to the same conclusion that there was "no reason" to

---

[21] Ninety-Day Subacute Rhesus Monkey Toxicity Study, Dec. 18, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; Aborted FC95 Monkey Study, Jan. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, *available at* https://static.ewg.org/reports/2019/pfa-timeline/1977_Most%20Toxic.pdf?_ga=2.34744996.426747500.1673645134-2012946541.1673645134.

[22] The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow, June 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.

[23] Acute Oral Toxicity (LD$_{50}$) Study in Rats (FC-143), May 5, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.

[24] *Id.* (FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.)

[25] Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.

[26] 3M Internal Correspondence from R. Howell to C. Olsen re: Fluorochemicals in the Environment with attachments, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1372.pdf.

notify the EPA of the finding.[27] 3M told the EPA in 1980 only that it had discovered PFOS in the blood of "some of our plant employees."

91.    By at least the end of the 1980s, additional research and testing performed by Defendant, including at least 3M, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

92.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers at its Washington Works plant in Parkersburg, West Virginia, where it had been using 3M's PFOA to manufacture Teflon since 1951. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[28]

93.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[29]  That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[30]  This finding

---

[27] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

[28] C-8 Blood Sampling Results, *available at* https://health.wvu.edu/research-and-graduate-education/research/c8/results/clinical-laboratory-tests/

[29] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[30] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[31]

94.     In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[32] That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[33] This finding was later shared with DuPont and led the two companies to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[34]

95.     In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo: "we must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[35]

**1990s-2000s: 3M Under Scrutiny**

96.     Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or

---

[31] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[32] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[33] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

[34] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[35] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

97.     Despite its decades of research, 3M waited until May 1998 to submit a report to the EPA under TSCA Section 8(e). Even in that submission, however, 3M downplayed what it knew, according to a former employee:

> Just before that submission we found PFOS in the blood of eaglets—eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probable bioaccumulation and bio-magnification. This is a very significant finding that the 8(e) reporting rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.[36]

98.     Although 3M acknowledged, in 1998, the presence of PFOS in the blood of the general population, it insisted that it did not "believe that any reasonable basis exists to conclude that PFOS 'presents a substantial risk of injury to health or the environment.'" Internally, the message was quite different: 3M's Manager of Corporate Toxicology advised the company to replace "PFOS-based chemistry as these compounds [are] ***VERY persistent and thus insidiously toxic.***"

99.     In 2000, 3M, after half a century of manufacturing fluorinated chemicals through ECF, announced that it would phase out its production of several long-chain PFAS compounds, including PFOA, although it continued to manufacture other PFAS chemicals.

100.    In April 2006, 3M agreed to pay EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS dating back decades.

---

[36] Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

101.    Likewise, in December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.

102.    On information and belief, 3M knew or should have known that products containing PFOS would very likely injure and/or threaten public health and the environment, even when used as intended or directed.

103.    3M failed to warn of these risks to the environment and public health, including the impact of its product on the quality of unprotected water sources.

104.    3M was sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing PFOS. 3M understood far more about the properties of PFOS—including the potential hazards they posed to human health and the environment—than any of its customers. Still, 3M declined to use its sophistication and knowledge to design safer products or to warn about the hazards of its existing products.

### C.    The Impact of PFOA and PFOS on the Environment and Human Health Is Finally Revealed

105.    As described above, 3M failed to comply with its obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by PFOS. *See* TSCA § 8(e).

106.    Despite decades of research, 3M did not share any of its concerns with EPA until the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information," according to a former 3M employee.[37]

---

[37] Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

107.    On information and belief, 3M began in 2000 to phase out its production of products that contained PFOS and PFOA in response to pressure from the EPA.

108.    Once the truth about PFOS and PFOA was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel" formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

109.    The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, it found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

110.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

111.    The injuries caused by PFAS can arise months or years after exposure.

112.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendant repeatedly assured and represented to governmental entities, its customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

113.    Furthermore, Defendant has represented to and assured such governmental entities, its customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendant to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

114.    At all relevant times, 3M, through its acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

### D.    Federal, State, and International Government Agencies Call for Monitoring and Cleanup of PFAS Contamination

115.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3 Rule"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[38]

116.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and development of safe

---

[38] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[39]

117.    On May 25, 2016, the EPA released a lifetime health advisory (HAs) and health effects support documents for PFOS and PFOA.[40] The EPA developed the HAs to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAs identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAs were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOS. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

a.  Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b.  Cancer (testicular and kidney);

c.  Liver effects (tissue damage);

d.  Immune effects (e.g., antibody production and immunity);

e.  Thyroid disease and other effects (e.g., cholesterol changes).

118.    In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health."[41]

---

[39] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[40] Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

[41] *Id.*; *see also National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.").

119.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFAS. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[42]

120.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[43]

121.    California added PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[44]

122.    The U.S. Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate PFAS contamination from military bases, as well as devoting $7 million toward the Investing in Testing

---

[42] U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[43] Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[44] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[45]

123.    In February 2018, the Wisconsin Department of Natural Resources ("WDNR") stated that PFAS compounds meet the definition of hazardous substance and/or environment pollution under Wis. Stat. § 292.01. Therefore, persons responsible for the discharge of PFAS to waters of the State of Wisconsin were required to immediately notify the state, conduct a site investigation, determine the appropriate clean-up standards, and perform the necessary response actions. Wis. Admin. Code chaps. NR 700-754. The non-industrial direct contact soil residual contaminant levels (RCLs) for both PFOA and PFOS is 1.26 mg/kg. The industrial direct contact RCL for both PFOA and PFOS is 16.4 mg/kg.[46]

124.    Wisconsin currently follows the EPA HAL of 70 ppt for combined PFOA and PFOS levels.

125.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and the EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[47]

126.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS)

---

[45] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[46] Department of Natural Resources, *Wisconsin DNR's Remediation and Redevelopment Program Has Authority to Regulate Emerging Contaminants- including PFAS Compounds* (last visited September 25, 2018). https://dnr.wi.gov/topic/brownfields/documents/bsg/1802PFCarticle.pdf

[47] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

nationwide."[48] Following a public comment period on its proposed decision, the EPA will decide whether to move forward with the process of establishing a national primary drinking water regulation for PFOA and PFOS.

127.    On April 10, 2024, EPA announced enforceable levels for PFOA and PFOS in drinking water. EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L).

128.    Effective July 9, 2024, the EPA designated both PFOA and PFOS as "hazardous substances" under CERCLA, based on its determination that "they may present a substantial danger to the public health or welfare or the environment when released."[49]

**The Putative Class and Plaintiffs' Exposure and Damages**

129.    High levels of PFOA and PFOS in groundwater have been detected at the Greystone Facility. Reported total concentrations are as high as 310 ng/l (micrograms per liter and also expressed as ppt) for PFOS. The drinking water wells of nearby households in the Village of Maine have also tested positive for contamination.

130.    Plaintiffs and the Putative Class obtain their water from private wells. PFAS testing from private wells shows PFOS levels of 15 ng/L and 12 ng/L for PFOA.

131.    Plaintiffs and the Putative Class have been injured as a result of consuming water with elevated levels of PFAS, including PFOS. As the sole manufacturer of PFOS, 3M's products would have been the source of any PFOS found in the water consumed by Plaintiffs and the Putative Class.

---

[48] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[49] Final Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024) (https://www.govinfo.gov/app/details/FR-2024-05-08/2024-08547).

132.     Plaintiffs and the Putative Class have been exposed to PFAS, have elevated levels of these contaminants in their blood, and are at an increased risk of health effects, including but not limited to kidney cancer, testicular cancer, thyroid cancer, ulcerative colitis, thyroid disease, and liver cancer.

133.     Plaintiffs and the Putative Class have a legitimate fear of developing additional injuries as a result of their exposure to PFAS, including but not limited to kidney cancer, testicular cancer, thyroid cancer, ulcerative colitis, thyroid disease, and liver cancer.

134.     Plaintiff and the Putative Class have suffered property damage and diminution of property value as a result of the PFAS contamination caused by PFOS, of the private water supplies.

135.     As a result of years of consuming contaminated water, Plaintiffs and the Putative Class, as residents of the Village of Maine, Wisconsin, have been unknowingly exposed for many years to PFAS at concentrations hazardous to their health through the ingestion of PFOA and PFOS.

136.     The properties of Plaintiffs and the Putative Class have been damaged as a result of the presence of PFAS in their homes, their soil, surrounding property and potable water supply.

137.     Plaintiffs and the Putative Class seek recovery from 3M for damages and losses suffered by Plaintiffs, each of whom suffered injuries as a direct and proximate result of exposure to and consumption of PFOS-contaminated water from private drinking water supplies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## CLASS ACTION ALLEGATIONS

138.     Plaintiffs incorporate the foregoing paragraphs as though the same were forth at length herein.

139.     Plaintiffs seek to certify and maintain this action under Federal Rule of Civil Procedure 23(a), (b)(1) and/or (b)(2), and (b)(3), on behalf of a class (the "Class"), comprised of

themselves and other similarly situated current and former residents of the Village of Maine, Wisconsin (the "Class Members"), subject to amendment and additional discovery as follows:

a.     **Medical Monitoring Class**: Individual residents of the State of Wisconsin who have ingested PFOS-contaminated water from a private well in or around the Village of Maine, Wisconsin, and who have suffered accumulation of PFOS in their bodies as demonstrated by blood serum tests or documentation of an increased opportunity for exposure.

b.     **Property Damage Class**: Individual residents of the State of Wisconsin who own real property in or around the Village of Maine, Wisconsin, whose private water wells have been contaminated with PFOS. The members of this Class can be readily ascertained by census data, property records, and county records.

140.    Plaintiffs are members of the proposed Classes they seek to represent. This action satisfies numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.

141.    Excluded from the Class are:

i.     Legal representatives, employees, officers, directors, assigns, heirs, successors, or other persons associated with Defendant 3M;

ii.     The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; and

iii.     Any class counsel or their immediate family members.

142.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

**Numerosity and Ascertainability**

143.    This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1 ) given that the number of impacted individuals in the Village of Maine, Wisconsin, and property owners, upon information and belief, has reached the thousands, making individual joinder of Class Members' respective claims impracticable. While the exact number of Class Members is not yet known, a precise number can be ascertained from U.S. Census records and records of the State of Wisconsin and municipal entities, and through other appropriate discovery. The resolution of the claims of the Class Members in a single action will provide substantial benefits to all parties and the Court. It is expected that the Class Members will number in the tens of thousands.

144.    Finally, Class Members can be notified of the pendency of this action by Court-approved notice methods.

**Typicality**

145.    Pursuant to the Fed. R. Civ. P. 23(a)(3),  Plaintiffs' claims are typical of the claims of Class Members and arise from the same course of conduct by Defendant. Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred damages and losses related to the introduction of PFOA, PFOS, and other PFAS into the private wells in the area, causing personal injury and property damages.

146.    Furthermore, the factual bases of 3M's actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

**Adequacy of Representation**

147.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the classes they seek to represent.

148.    Further, Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

149.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to the Classes.

<strong>Predominance of Common Issues</strong>

150.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members. Fed. R. Civ. P. 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

  i.    Whether 3M engaged in the conduct alleged herein.

 ii.    Whether 3M knew or should have known that exposure to PFOS could increase health risks.

iii.    Whether 3M knew or should have known that its manufacture of PFOS was unreasonably dangerous.

 iv.    Whether 3M knew or should have known that its PFOS contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies.

  v.    Whether 3M failed to sufficiently warn of the potential for harm that resulted from the use and testing of its PFOS.

 vi.    Whether 3M became aware of the health and environmental harm caused by PFOS and failed to warn users and Plaintiffs and the Classes of same.

vii.    The extent to which 3M knew about PFOS contamination in the water and water supply systems in the Village of Maine, Wisconsin.

viii. The extent to which 3M knew about PFOS contamination in the water supplied to private wells of residents in the Village of Maine, Wisconsin.

ix. Whether the 3M owed a duty to Plaintiffs and the Classes to refrain from the actions that caused the contamination of their drinking water with PFOS.

x. Whether 3M made unlawful and misleading representations or material omissions with respect to the health impacts of PFOA and PFOS.

xi. For the Medical Monitoring Class, whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFOS while living in the Village of Maine, Wisconsin.

xii. For the Property Damage Class, whether PFOS contamination is caused and continues to cause:

   (1) A continuous invasion of the property rights of Plaintiffs and Class such that the property values within the Village of Maine, Wisconsin have declined, and/or continue to decline, in value following the disclosure of the PFOS contamination; and

   (2) Have substantially interfered with Plaintiffs' and the Class's use and enjoyment of their property.

xiii. Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

xiv. Whether the members of the Medical Monitoring and Property Damage Classes have sustained damages and, if so, the proper measure of damages.

xv. Whether 3M is strictly liable to Plaintiffs and the Classes for their actions.

xvi. Whether 3M is otherwise liable to Plaintiffs and the Classes for their actions.

151.     The basis for all of Class Members' claims is 3M's course of conduct and knowledge of the potential hazards of PFOS or other similar PFAS chemicals. All Class Members suffered common injuries: health effects and/or property damage caused by exposure to increased levels of PFOS. Further, the method of contamination that led to this common injury is uniform: migration of PFOS from the 3M Greystone Facility and Quarry into the soil and drinking water supply in the Village of Maine, Wisconsin. Thus, each of the Class Members' injuries was caused by a common course of conduct undertaken by 3M.

152.     Plaintiffs' claims arise from the same course of conduct, giving rise to the claims of the Class Members, meaning the entire matter of 3M's liability in this case can be adjudicated on a class basis to avoid a waste of judicial resources and inconsistent judgements.

## Superiority

153.      The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Given the great number of individuals in the Village of Maine, Wisconsin, impacted by Defendant's conduct, it is impracticable for Plaintiffs and the Classes to individually litigate their respective claims due to the risk of inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## CAUSES OF ACTION

## AS AND FOR A FIRST CAUSE OF ACTION: NEGLIGENCE

154.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

155.     This cause of action is brought pursuant to Wisconsin law.

156.    3M failed to employ reasonable care which a reasonably prudent person should use under the circumstances by transporting, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOS, in a way permitting its release into the soil and groundwater.

157.    The contamination of the groundwater supply with PFOS was a foreseeable consequence of 3M's actions at the Greystone Facility and Quarry.

158.    3M owed Plaintiffs a cognizable duty to exercise reasonable care in the transporting, testing, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOS.

159.    Upon learning of a release of toxic substances, including but not limited to PFOS, 3M owed Plaintiffs a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated and reached Plaintiffs' drinking water wells.

160.    3M breached that duty by failing to act reasonably in the transporting, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOS.

161.    3M failed to take reasonable, adequate and sufficient steps or action to eliminate, correct or remedy a release of PFOS after it occurred.

162.    Upon learning of a release of toxic substances, including but not limited to PFOS, 3M owed Plaintiffs a duty to timely notify Plaintiffs that the aforementioned release in the vicinity of the Greystone Facility and Quarry had occurred.

163.    3M breached that duty by failing to timely notify Plaintiffs of any releases of toxic substances, including but not limited to PFOS, into the environment in the vicinity of the Greystone Facility and Quarry, and consequently, in the vicinity of Plaintiffs' drinking water wells.

164.    3M negligently breached its duties to Plaintiffs to ensure that its transporting, manufacturing, consuming, using, utilizing, storing, handling and/or disposing of toxic substances, including but not limited to PFOS, was carried out in a safe and sufficiently secure manner so as to prevent the release of toxic substances, including but not limited to PFOS, into the environment surrounding its facilities, and consequently, Plaintiffs' drinking water wells.

165.    3M's breach of duties was the direct, sole and proximate cause of Plaintiffs' damages and imminent, substantial and impending harm to Plaintiffs' drinking water wells.

166.    As a direct result of the foregoing, Plaintiffs seek compensatory damages in a sum to be determined by a jury at the time of trial.

## AS AND FOR A SECOND CAUSE OF ACTION:
## TRESPASS

167.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

168.    This cause of action is brought pursuant to Wisconsin law.

169.    3M disposed roofing granules at the Greystone Facility and Quarry with knowledge that large quantities of toxic PFOS would contaminate the air, soil and groundwater.

170.    3M allowed PFOS to travel to the surrounding groundwater, causing contaminations of various private drinking water wells, including those of Plaintiffs, in various locations, in varying amounts at various times.

171.    3M owed Plaintiffs a cognizable duty to exercise reasonable care to ensure that PFOS used and disposed of at the Greystone Facility and Quarry was disposed of reasonably and properly so as not to discharge PFOS into the environment.

172.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by 3M, 3M had good reason to know or expect that large quantities of PFOS would and/or could be introduced into the persons and property of Plaintiffs.

173.    The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause PFOS to be disbursed into the land.

174.    3M's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOS to be released into Plaintiffs' drinking water wells.

175.    3M's willful, wanton, and intentional failure to act and/or its affirmative choices of actions and following courses of actions have caused PFOS to enter and trespass upon the land and realty of Plaintiffs and cause an injury to their possession and/or right of possession.

176.    Plaintiffs have not consented and do not consent to the trespass and contamination alleged herein. 3M knew or reasonably should have known that Plaintiffs did not and do not consent to this trespass.

177.    These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs, their property and their right of possession of their property.

178.    Further, 3M's actions in introducing unknown quantities of PFOS into the drinking water of the Village of Maine, Wisconsin, and, consequently, the persons and property of Plaintiffs were done with actual malice, and in wanton, willful and/or reckless disregard for Plaintiffs' rights, health, and property.

179.    Additionally, and/or alternatively, 3M's decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFOS release and contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton, willful and/or reckless disregard for the rights, health, and property of Plaintiffs.

180.     Accordingly, Plaintiffs seek general damages from 3M, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons which includes but is not limited to pain and suffering and the need for medical monitoring and direct, consequential, and nominal damages flowing from the trespass which are the natural and proximate result of 3M's conduct in an amount to be proved at trial.

**AS AND FOR A THIRD CAUSE OF ACTION:**
**ABNORMALLY DANGEROUS ACTIVITY**
**AND ABSOLUTE AND STRICT LIABILITY**

181.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

182.      This cause of action is brought pursuant to Wisconsin law.

183.     3M's manufacturing, operational, and disposal practices related to material contaminated with PFOS and/or other ultra-hazardous toxins was negligent, reckless, and/or intentional and constituted an ultra-hazardous or abnormally dangerous activity for which 3M is strictly liable.

184.     The 3M manufacture, use, mishandling, and disposal of material that contained PFOS was inappropriate, given PFOS's toxicity and danger to human health, at the Greystone Facility and Quarry due to its proximity to the sources of drinking water private wells.

185.     As a result, 3M allowed or caused these ultra-hazardous and abnormally dangerous substances to leach into the land and groundwater surrounding the Greystone Facility and Quarry, including the potable water supply relied upon by Plaintiffs.

186.     Further, 3M's contamination of the potable water supply with PFOS creates the likelihood for personal injury and property damage to individuals who use and rely upon the water.

187.     3M's manufacture, use, mishandling, and disposal of PFOS and its reckless disregard for the consequences of its actions caused the existence of a high degree of harm to both Plaintiffs and their property. Given the nature of PFOS, the likelihood of this harm was great.

188.     The risk of such activities outweighs any value associated with the same. As the result of the said ultra-hazardous or abnormally dangerous activities, Plaintiffs have suffered damages and imminent, substantial, and impeding harm to their health, their families, to the value of their home and property, and Plaintiffs have expended or will be forced to expend significant resources to safeguard their health and their property, obtain monitoring, testing, remediating services or equipment, as well as health monitoring indefinitely for years and decades into the future.

189.     3M is strictly liable in tort for personal injury and property damage sustained by Plaintiffs.

190.     Accordingly, Plaintiffs seek general damages from 3M, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, including medical monitoring, and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of 3M's conduct in an amount to be proved at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION:
## PRIVATE NUISANCE

191.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

192.   This cause of action is brought pursuant to Wisconsin law.

193.   3M's reckless, intentional and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFAS, including PFOS, into the environment, contaminating the private wells from which Plaintiffs obtained their drinking water.

194.   The discharge of PFOS into the environment resulted in the contamination of Plaintiffs' groundwater and water supply with hazardous levels of PFOS.

195.   The contamination of the groundwater and water supply has prevented and continues to prevent Plaintiffs from consuming or using the water at their property or residence and constitutes a substantial interference with the right of Plaintiffs and their property.

196.   The inability to use potable drinking water at their residences has caused Plaintiffs significant inconvenience and expense.

197.   By reason of the foregoing, 3M is liable to Plaintiffs for the damages that they have suffered as a result of 3M's actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

198.   Accordingly, Plaintiffs seek general damages from 3M, in an amount to be determined at trial, directly resulting from the their injuries in an amount sufficient to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass,

injury to persons, including the need for medical monitoring, and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of 3M's conduct in an amount to be proved at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION:
## PRODUCTS LIABILITY – FAILURE TO WARN

199.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

200.   This cause of action is brought pursuant to Wisconsin law.

201.   3M knew or should have known that exposure to PFOS was hazardous to the environment and to human health.

202.   3M knew or should have known that the manner in which it was manufacturing and disposing roofing granules was hazardous to human health and the environment because it contained PFOS.

203.   3M knew or should have known that the manner in which it was manufacturing and disposing roofing granules containing PFOS, due to the proximity of the Greystone Facility and Quarry, result in the contamination of the environment, groundwater, and the private water supplies in the Village of Maine, Wisconsin.

204.   3M had the duty to warn of the hazards associated with PFOS entering and poisoning the environment and groundwater because it knew of the dangerous, hazardous and toxic properties of roofing granules containing PFOS.

205.   3M failed to provide sufficient warning that the use, manufacturing and storage of 3M's product would cause the product to be released into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOS.

206.    Further, this contamination led to the exposure and bioaccumulation of PFOS in Plaintiffs and the Medical Monitoring Class Members, and thereby increased their risk of developing numerous diseases as more fully set forth above.

207.    3M's breach of its duty to timely notify Plaintiffs' community and act reasonably in warning of the presence of PFOS in the roofing granules, Plaintiffs and the Class Members were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class Members have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of 3M's negligence for many years.

208.    Adequate precautions, instructions and warnings could have reduced or avoided these foreseeable risks of harm to Plaintiffs and the Class Members and their properties.

209.    Had 3M provided adequate warnings, Plaintiffs and the Class Members could have taken measures to avoid or lessen their exposure.

210.    Had 3M provided adequate warnings to Plaintiffs like those consuming water near its facilities, steps could have been taken to reduce or prevent the release of PFOS into the environment, groundwater, and Plaintiffs' drinking water wells.

211.    3M's failure to warn was a direct and proximate cause of the environmental and health impacts from PFOS that came from the manufacturing, storage and disposal of the roofing granules at the Greystone Facility and Quarry.

212.    As such, 3M's failure to provide adequate and sufficient warnings for the roofing granules it manufactured, marketed, and sold renders the roofing granules a defective product.

213.    As a result of 3M's conduct and the resulting contamination, the value and marketability of the properties owned by Plaintiffs' and Property Damage Class has been diminished and will continue to be diminished. Plaintiffs and the Property Damage Class Members

have suffered the need for, and the cost of, remediation of their properties and or mitigation systems for those properties, and the cost of alternative water.

214.    As a result of the contamination, Plaintiffs and the Property Damage Class Members have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by 3M.

215.    As a result of 3M's conduct and the resulting contamination, Plaintiffs and the Classes have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

## AS AND FOR A SIXTH CAUSE OF ACTION:
## COST RECOVERY LIABILITY PURSUANT TO 42 U.S.C. § 9607 (CERCLA)

216.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as is full restated herein.

217.    Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

218.    Defendant is an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

219.    Defendant's location is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

220.    PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

221.    There has been a release, and continue to be releases, and/or disposal of hazardous substances and other PFAS from Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

222.    The hazardous substances and PFAS released from Defendant's facility were released within Plaintiffs wells and have and are migrating to Plaintiffs' private wells.

223.    Plaintiffs have incurred and will continue to incur necessary response costs to address the release or threatened release of hazardous substances and PFAS from Defendant's facility.

224.    Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances and PFAS that have contaminated Plaintiffs' private wells.

225.    By reason of the foregoing, Defendant is liable for Plaintiffs' necessary response costs, and damages, regarding PFAS contamination to Plaintiffs' private wells.

## AS AND FOR A SEVENTH CAUSE OF ACTION: DECLARATORY JUDGMENT PURSUANT TO 42 U.S.C. §§ 9607(A) AND 9613(G)(2) (CERCLA)

226.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as is full restated herein.

227.    By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA 42 U.S.C. § 9613(g)(2), Plaintiffs are entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in Plaintiffs' private wells as referenced herein.

228.     A declaratory judgment will prevent the need for multiple lawsuits as Plaintiffs continue to incur costs for which Defendant is liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

229.     A declaratory judgment will establish Defendant's allocation of costs associated with addressing the contamination of the private wells, insuring an equitable and efficient response to the problem.

230.     Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiffs' private wells.

231.     Plaintiffs will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of their property and their private wells with hazardous substances and PFAS.

232.     Plaintiffs' future costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

233.     Plaintiffs are thus entitled to a declaratory judgment regarding Defendant's liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## PUNITIVE DAMAGES

234.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

235.     Upon information and belief, 3M engaged in willful, wanton, malicious, and/or reckless conduct that caused the foregoing injuries, property damage, nuisances, and trespasses upon the persons and properties of Plaintiffs, disregarding their protected rights.

236.    3M's willful, wanton, malicious, and/or reckless conduct includes but is not limited to 3M's failure to take all reasonable measures to ensure PFOS-containing materials would be effectively disposed of and not released into the surrounding environment and groundwater supplies.

237.    3M has caused great harm to the property and water supplies of Plaintiffs and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

238.    3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud and/or malice, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiffs request an award of punitive damages in an amount enough to punish 3M and that fairly reflects the aggravating circumstances alleged herein. 3M is strictly, jointly and severely liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against 3M, and each of them, jointly and severally, and request the following relief from the Court:

A.  A declaration that 3M acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and the Class Members.

B.  An award of damages sufficient to establish a medical monitoring protocol for Plaintiffs and the Medical Monitoring Class.

C.  An award of damages for all harmful health impacts suffered by Plaintiffs and the Class Members caused by PFOS exposure.

D.  An award to Plaintiffs of general, compensatory, exemplary, consequential, nominal, and punitive damages;

E.  An order for an award of attorney fees and costs, as provided by law;

F.  An award of pre-judgment and post-judgment interest as provided by law, and

G.  An order for all such other relief the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury of any and all issues in this matter.

Dated: December 4, 2024                             Respectfully submitted,

                                           */s/ Daniel W. Varline*
Daniel W. Varline (SBN 1024016)
**DAVCZYK & VARLINE, LLC**
1400 Merrill Avenue
PO Box 1192
Wausau WI  54402-1192
Tel. (715) 675-7777
dvarline@dvlawoffice.com

Hunter J. Shkolnik *(Pro Hac Vice Forthcoming)*
Paul J. Napoli *(Pro Hac Vice Forthcoming)*
Coral M. Odiot *(Pro Hac Vice Forthcoming)*
Cristina M. Rodríguez *(Pro Hac Vice Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
San Juan PR  00907-3982
Tel. (833) 271-4502
hunter@nsprlaw.com
pnapoli@nsprlaw.com
codiot@nsprlaw.com
crodriguez@nsprlaw.com

Andrew W. Croner *(Pro Hac Vice Forthcoming)*
Patrick J. Lanciotti *(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue
Floor 11
New York NY 10017

Tel. (212) 397-1000
acroner@napolilaw.com
planciotti@napolilaw.com

***Counsel for Plaintiffs and the Putative Class***